UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
JONATHAN DIAZ,

                     Plaintiff,

     -against-

THE CITY OF NEW YORK, CAPT. FALLON,
DEPT. MALENDEZ, CAPT. FUGA, CAPT. LEBRON,
JOHN AND JANE DOES, 1-5, ET AL.,

                     Defendants.
-------------------------------------------------------------------x

**COMPLAINT**

Jury Trial

       Plaintiff JONATHAN DIAZ (hereinafter "Plaintiff") by and through his attorneys, Robert Blossner, Esq. and Vik Pawar, Esq., respectfully alleges as follows:

### PRELIMINARY STATEMENT

       1.    Plaintiff brings this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. §§1983, 1985 and 1988 for violations of his civil rights, as secured by statutes and the Constitution of the State of New York and the United States.

### JURISDICTION

       2.    The action is brought pursuant to 42 U.S.C. §§1983, 1985 and 1988, and the First, Fourth, Eighth and Fourteenth Amendments to the United States and New York Constitutions.

       3.    Jurisdiction is found upon 28 U.S.C. §§1331, 1343, 1367.

## VENUE

4. Venue is properly laid in the Eastern District of New York under 28 U.S.C. § 1391(b), in that it is the District in which the claim arose.

## JURY DEMAND

5. Plaintiff respectfully demands a trial by jury of all issues in the matter pursuant to Fed. R. Civ. P. 38 (b).

## PARTIES

6. Plaintiff is a citizen of the United States, and at all relevant time resident in the County of Bronx, State of New York.

7. Defendants The City of New York is a municipal corporation and the named and John and Jane Does 1-5 are officers ("John Does") with the NYC Department of Corrections (hereinafter "Rikers" or "DOC"). The individual defendants are sued in their individual, supervisory and official capacities.

## FACTS

8. In May, 2016, plaintiff was housed inside the GMDC Housing area within Rikers Island, when John Doe defendants rushed inside his housing area and started assaulting inmates including plaintiff.

9. The John Doe defendants were randomly selecting inmates and assaulting them.

10. After plaintiff was assaulted, his hands were flex-cuffed, so tight that it caused stoppage of blood circulation and tears on his wrists.

11. Plaintiff was taken to the intake area where he questioned the assault and unnecessary force used on him. At that point, defendant Fallon grabbed plaintiff by his flex-cuffs and dragged him inside a nearby holding cell and proceeded to punch him in the face and banged his head into the wall shouting that he needed to stay quite.

12. Plaintiff requested medical treatment for his injuries but was denied.

13. In the same month in May, 2016, plaintiff was in the same housing area of GMDC plaintiff cards with other inmates, when defendants Fuga, Malendez and other John Doe decided to conduct a random search of the cells.

14. The defendants grabbed plaintiff and dragged him to his jail cell for an "inspection" and search for "contraband."

15. When defendants found nothing illegal they questioned plaintiff about a pair of pants inside his jail cell. When plaintiff informed them that this was the only pair of pants that he had for court, one of the John Doe defendants charged at him and started assaulting him. Instead of intervening and stopping the assault, the other defendants joined in on the attack, punching and kicking plaintiff in the face and stomach as plaintiff curled up in a fetal position. Defendants then planted a razor to justify their actions.

16. Although visibly injured, plaintiff was, once again, denied medical treatment and left inside of his cell with flexi-cuffs that were so tight that he lost feeling in his wrists and hands for an entire week.

17. In June, 2016, plaintiff was returning from school and when he arrived in the GMDC housing area, he was informed that he was being moved.

18. Plaintiff wanted to pack his items but was told defendants that they already packed his items for him. When plaintiff asked whether he could make sure all

his items were in the bag, defendants held plaintiff down while defendant Lebron sprayed plaintiff with MK-9 and then left him in the intake area for several hours before taking him to the showers. Plaintiff had not provoked any incident and was instead assaulted for no apparent reasons and denied medical care.

## AS AND FOR A FIRST CAUSE OF ACTION
(Excessive use of force/Unlawful Seizure-Fourth Amendment)

19. Plaintiff repeats, reiterates, and realleges each and every allegation in the foregoing paragraphs with the same force and effect as if fully set forth herein.

20. Defendants assaulted plaintiff for no reason.

21. Defendants continued to assault plaintiff even though plaintiff was handcuffed, was not resisting and did not pose a danger to himself or others.

22. Defendants' actions resulted in serious and permanent physical and emotional injuries to plaintiff.

23. As a result of the aforementioned conduct of Defendants, Plaintiff's constitutional right to be free from seizure, excessive force and assault were violated and he sustained physical, economic and emotional injuries.

## AS AND FOR A SECOND CAUSE OF ACTION
(Deprivation of Rights under 14th Amendment-Due Process against All defendants)

24. Plaintiff repeats, reiterates, and realleges each and every allegation in the foregoing paragraphs with the same force and effect as if fully set forth herein.

25. The Defendants' conduct herein was an abuse of executive power so clearly unjustified by any legitimate objective of law enforcement as to be barred by the Fourteenth Amendment. The actions by Defendants deprived the substantive and procedural due process afforded to Plaintiff and was in violation of Plaintiff's

constitutional rights under the Fourth and Fourteenth Amendments. Defendants falsely reported plaintiff's condition and prolonged his suffering.

26. As a result of the foregoing, Plaintiff was deprived of his liberty and property interests and right to procedural and substantive due process, causing economic and severe and permanent emotional and physical injuries.

## AS AND FOR A THIRD CAUSE OF ACTION
(Failure to Intervene)

27. Plaintiff repeats, reiterates, and realleges each and every allegation in the foregoing paragraphs with the same force and effect as if fully set forth herein.

28. Defendants witnessed their fellow officers assault plaintiff.

29. Despite witnessing the alleged assault on plaintiff, defendants failed to intervene.

30. Defendants had ample opportunity to stop the further assault by fellow officers on plaintiff but yet simply stood there and allowed plaintiff to be further assaulted and participated in the assault.

31. As a result of defendants' conduct, plaintiff suffered injuries.

## AS AND FOR A FOURTH CAUSE OF ACTION
(*Monell* claims against the City of New York)

32. Plaintiff repeats, reiterates, and realleges each and every allegation in the foregoing paragraphs with the same force and effect as if fully set forth herein.

33. Defendant City through the DOC was deliberately indifferent to the rights of plaintiff. The City is well aware of the barbaric acts by the individuals employed at Rikers but yet fail to curb the violence against inmates, discipline or train its employees.

34. Defendant City is aware that defendant officers would face similar situations described in this complaint, but they fail to adequately train their officers on these scenarios. This deliberate indifference to the failure to train or otherwise failure to discipline officers in these types of situations led to the deprivation of plaintiff's constitutional rights and plaintiff was injured.

35. SDNY U.S. Attorney has presented a truly horrifying report detailing how inmates are treated in New York City jails. "it is a place where brute force is the first impulse rather that the last resort, a place where verbal insults are repaid with physical injuries, where beatings are routine, while accountability is rare."[1]

36. According to a Department of Justice investigation's findings as reported by the New York Times and Associated Press there is a "deep-seated culture of violence" against inmates, including 1,057 injuries among makes in 565 reported incidents in fiscal 2013. (The report covers 2011 through 2013).[2]

37. The report states "Inmates see others being beaten and attacked and are afraid that they will face the same fate," "Simply put, Riskers is a dangerous place for inmates and a pervasive climate of fear exists." "The most egregious inmate beatings frequently occur in locations without video surveillance." Those in charge also tend to lie. For example, one officer with 76 uses of force on the books over the span of six years was disciplined one time, the Times notes.

38. The report gives specific examples of abuse at Riker's Island:

---

[1] http://www.nytimes.com/2014/08/05/nyregion/us-attorneys-officer-reveals-civil-rights-investigation-at-rikers-island.html
[2] http://www.s3.documentcloud.org/documents/1240461/department-of-justice-letter-about-rikers-island.pdf)

In June 2012, in an apparent act of retribution, two correction officers forcibly took an inmate to the ground an beat him. The officers punched the inmate multiple times and kicked him in the head, resulting in serious injuries including a two0-centemeter laceration to his chin that required sutures, a lost tooth, and cracking and chipping to the inmate's other teeth. According to the inmate, who was interviewed by our consultant, prior to the incident one of the officers had called him a "snitch" and was under the false impression that the inmate had previously reported that the offer had been involved in another use of force incident.

An inmate reported that he was punched and stomped on by several officers in a school corridor after verbally insulting one of them during an argument. He asked to go to the medical clinic, but the officers refused to take him there, giving him tissues to clean himself up and telling him to "hold it down." The inmate also described another incident in which officers beat him, injuring his arm. They refused to take him to the clinic for medical care until he agreed to tell the clinic that he hurt his arm playing basketball. He agreed to that story, and as far as he knows, the use of force was never reported.

In August 2013, four adolescent inmates were reportedly brutally beaten by multiple officers. Based on accounts provided by the inmates, several officers assaulted the inmates, punching and kicking them and striking them with radios, batons, and broomsticks. The beating continued for several minutes after the inmates already had been subdued and handcuffed. The inmates were then taken to holding pens near the clinic intake where they were beaten again by several DOC Gang Intelligence Unit members, who repeatedly punched and kicked them while the inmates were handcuffed. Two of the inmates reported that they had lost consciousness or blacked out during the incident. The officers' written statements assert that the inmates instigated the fight and they used force only to defend themselves. The Department's investigation of the incident was ongoing at the time this letter was prepared. The inmates sustained multiple injuries, including a broken nose, a perforated eardrum, head trauma, chest contusions, and contusion and injuries to the head and facial area.

In January 2012, an inmate splashed a correction officer with a liquid substance. While the inmate was flex-cuffed and being escorted away, the correction officer approached him and started punching him in his facial area, according to the investigating Captain's report. The correction officer did not stop until a probe team officer pushed her away from the inmate. The Captain concluded that the force used was "not necessary, inappropriate and excessive," a Tour Commander later revered that position and conclude that the force used was necessary and within policy.

In January 2013, after reportedly being disruptive while waiting to enter the RNDC dining hall, an inmate, who was on suicide watch at the time, was taken down by a Captain and punched repeatedly on his head and upper torso while he lay face down on the ground covering his head with his hands. The inmate told investigators that the Captain had "punched [him] everywhere." According to the Tour Commander's report, the Captain's use of force was "excessive and avoidable" because the inmate presented no threat while lying on

the ground. The inmate sustained bruises to his left and right shoulders, left and right lower arms, chest area, neck, middle back, and finger on his right hand, as well as an abrasion to his right elbow.

An inmate told our consultant that in February 2013 a probe team Captain lifted his hands up while he was flex-cuffed, fracturing his wrist. According to the inmate's statements to DOC investigators, the Captain told him and the other inmates being escorted that "he would make them suffer," and "cry like babies." Another inmate told investigators the Captain had directed the officers to "make them scream" while the inmates were escorted through the corridor. We reviewed video of the incident showing the inmate being escorted down the corridor while rear-cuffed. We also reviewed medical records confirming that the inmate broke his left wrist as a result of the incident and required surgery. The Department's investigation of the incident was ongoing at the time this letter was prepared.

In January 2014, an inmate sustained significant facial injuries as a result of use of force incident that occurred in an RNDC school classroom. When interviewed by Board of Correction staff, the inmate reported that he was repeatedly punched and kicked in the head and face by multiple officers. The inmate claimed that the altercation began after a civilian employee's pen had been taken. The inmate was still spitting up blood and having difficulty talking when Board of Corrections staff interviewed him hours after the incident.

The ID's investigation into an incident involving an inmate who suffered a broken tooth and laceration of the lip when an officer punched him in the face was not completed until 20 months after the incident. The two key officers involved in the incident were not interviewed by the ID until 16 months after the incident.

39. The report concludes with recommendations to address the poor training and lack of accountability among the officers.

40. There are numerous other example of abuse at Riker's Island that are outside the scope of the report as well. The Bronx district attorney's office, said that the two Riker's guards had recruited inmates over three months to serve as "managers, foot soldiers and enforcers" to maintain order in a housing unit for adolescent men. The guards are also accused of training the inmates in how to restrain and assault their victims, and deciding where and when attacks would occur.

41. According to *New York Times,* some 129 inmates, 77% of whom were diagnosed as mentally ill suffered "serious injuries" in alterations with prison guards over

an 11-month period in 2013. These injuries were "beyond the capacity" of the prison doctors to treat successfully.

42. Jonathan Chasan, a lawyer for the Legal Aid Society's prisoners' rights project stated, "These are institutions where inmate activity is monitored 24 hours a day, and it's astonishing that this kind of behavior should go on for so long unchecked."

43. During Michael Hourihane's tenure as the top uniformed official in the city Department of Corrections, a class action lawsuit was filed against the DOC for system wide abuse of inmates by correction staff. Chasan stated the city has paid millions during his leadership to settle brutality lawsuits over the past decade.[3]

44. A cursory ECF search within the SDNY PACER system shows that Rikers Island has been named as a defendant over a hundred times in the Southern District alone.

45. The same search in the Eastern District yields dozens of results.

46. The same search in Bronx Supreme Court returned hundreds of cases.

47. Defendant City of New York cannot claim ignorance of the culture of violent and unconstitutional behavior when there are a multitude of lawsuits and dozens of newspaper articles alerting the City. Upon information and belief, the City was and is aware of the problems but has decided to ignore the situation.

48. Defendant City is also aware that individual correction officers routinely plant drugs or other contraband on inmates in order to cover-up their actions and justify the use of excessive force and discipline.

49. The department's failure to curb these patterns and practices that place inmates at ongoing risk of serious harm constitutes deliberate indifference to the inmates'

---

[3] blogs.villagevoice.com/runninscared/2012/12/michael_houriha.php

safety while in DOC custody and violates their constitutional rights. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) ("[P]rison officials; malicious and sadistic use of force is a per se violation of the Eight Amendment, because the conduct, regardless of injury, 'always' violates contemporary standards of decency.")

50. As a result the defendant City is liable under the elements articulated under *Monell*.

## AS AND FOR A FIFTH CAUSE OF ACTION
*(Cruel and Unusual Punishment/Assault and Denial of Medical Care)*

51. Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

52. At every incident described in this complaint, plaintiff suffered serious and painful injuries.

53. Instead of giving plaintiff prompt medical care, defendants were too busy drafting documents to cover-up their actions.

54. Plaintiff was denied prompt medical care and his suffering was prolonged unnecessarily.

55. As a result of this, defendants were deliberately indifferent to plaintiff's medical needs.

56. Furthermore, defendants' infliction of pain and suffering upon plaintiff through their assaults constituted cruel and unusual punishment barred by the Eighth Amendment.

57. As a result of the foregoing, plaintiff suffered injuries.

## AS AND FOR A SIXTH CAUSE OF ACTION
(*Conspiracy* under 42 U.S.C. 1985)

58. Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

59. Defendants targeted plaintiff and conspired with each other to deprive plaintiff of his civil rights and equal protection under the laws.

60. The individual defendants knew that plaintiff had not violated any infractions or was otherwise innocent of any charges but yet they fabricated charges against him.

61. In addition, the individual defendants conspired amongst themselves by fabricating use of force reports and "covering" each other's "backs" to justify their assault on plaintiff.

62. They did so they would avoid facing discipline or other penalties including perjury that would hurt their career and their promotion and salary.

63. Defendants did so because they knew they had falsely sworn documents recanting it would subject them to perjury and prosecution.

64. As a result of this conspiracy, plaintiff suffered constitutional injuries.

**WHEREFORE,** the Plaintiff requests that this Court:

    a. Award compensatory damages to the Plaintiff against the Defendants, jointly and severally, in the amount of Five Hundred Thousand for each and every cause of action,

    b. Award the costs of this action to the Plaintiff.

    c. Award reasonable attorneys fees to the Plaintiff under 42 U.S.C. Section 1988 and/or any other applicable laws.

    d. Award punitive damages as assessed by the jury.

    e. Award such other and further relief as this Court may deem appropriate.

Dated: New York, New York
       October 3, 2016

                                Pawar Law Group, P.C.
                                20 Vesey Street, Suite 1210
                                New York, New York 10007
                                (212) 571-0805
                                By: _____
                                   Vik Pawar (VP9101)
                                  *Attorneys for Plaintiff*